JOHN B. and DOLORES A. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket Nos. 10058-75, 6996-76.
United States Tax Court
T.C. Memo 1979-87; 1979 Tax Ct. Memo LEXIS 438; 38 T.C.M. (CCH) 351; T.C.M. (RIA) 79087; March 15, 1979, Filed John B. Miller, pro se. Jeff P. Ehrlich, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined income tax deficiencies of $620 for 1973 and $1,099 for 1974. Due to concessions by petitioners for 1974, the sole issue remaining is whether petitioner John B. Miller is entitled to a deduction under section 162(a)(2) [1] for travel expenses incurred while away from home. *439 the operator is laid off. Petitioner is qualified to operate FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of filing their petition, petitioners John B. and Dolores A. Miller were residents of Lander, Wyoming. Dolores is a party only by virtue of having filed joint returns with her husband. When we hereafter refer to petitioner, we will be referring to John. Petitioner and his family have resided in Lander, Wyoming, since April 1969. Petitioner moved to Lander from Philadelphia, Pennsylvania, because he and his wife liked the community and felt it would be a good location to raise their children. Petitioner is an operator of construction equipment on heavy construction jobs. The equipment operator's job, as a service craft job, is dependent upon the concurrent employment of the skilled workers. [2] For example, an operator may be hired to operate equipment for a group of iron workers who are setting steel. If a trainload of steel is delayed and as a consequence the iron workers run out of materials, then, because the iron workers have no need for the equipment operator, several types of construction machines including *440 earth scrapers, bulldozers, small hydraulic cranes and utility equipment like construction heaters. During the years in issue petitioner was a member of Local 400 of the Operating Engineers Union. He obtained employment through the union's hiring hall. Under the union's system, when petitioner was unemployed, he would inform the union, and his name and the type of equipment he was qualified to operate would be placed at the bottom of the "out of work list." At times there were as many as 400 union members' names on the list. When a contractor needed an operator for a specific piece of equipment the contractor contacted the union hall and requested such an operator. The union hall searched the out of work list, starting at the top, for the first man qualified to operate that specific piece of equipment.That operator was then dispatched by the union to the contractor. The union dispatched members to approximately 200 contractors throughout the State of Wyoming. The union hall was located in Casper, Wyoming, approximately 150 miles east of petitioner's residence in Lander, Wyoming. It was not necessary *441 for petitioner to travel to Casper to have his name placed on the out of work list; he simply telephoned the union hall from his residence. Petitioner worked at various temporary locations in Wyoming between April 1969 and July 1972. On July 7, 1972, petitioner was dispatched to Bechtel Power Plant Corporation ("Bechtel") to work as a front end loader operator at the Jim Bridger Power Plant. Bechtel was the prime contractor involved in the construction of the Jim Bridger Power Plant, a new, large, coal-fired power plant near Rock Springs, Wyoming. The original estimated completion time for the construction project was five to six years. Petitioner had no contract with Bechtel. Petitioner's union did not guarantee any length of time during which petitioner would be employed at this project. He was laid off by Bechtel on October 11, 1972. At that time petitioner called his union which put his name at the bottom of the out of work list. He remained out of work until November 2, 1972. On November 2 he was dispatched to Bechtel again, this time as a heater operator at the Jim Bridger Power Plant. Heaters were used during the winter months to keep freshly poured concrete from *442 freezing and to allow it to cure properly. Petitioner was laid off on November 22, 1972, but he was rehired in the same capacity through the union hiring hall on November 27, 1972. That assignment lasted until May 5, 1973, when warmer weather arrived. Petitioner's name was again placed at the bottom of the out of work list and, on June 7, 1973, he was redispatched to Bechtel as a hydraulic crane operator working with electricians at the Jim Bridger Power Plant. Petitioner was not laid off again until March 25, 1976. During petitioner's 34 months of continuous employment with Bechtel as a hydraulic crane operator, the number of hydraulic crane operators employed by Bechtel at that project fluctuated between five and eighteen. These operators worked with iron workers, pipe fitters and electricians. When one of these skilled crews completed its work, the crane operator was laid off. During the 34 months petitioner had no way of knowing month by month how much longer he could expect that particular employment to last. After he was laid off by Bechtel on March 25, 1976, petitioner was dispatched by his union to a contractor in the area of Gillette, Wyoming, approximately 400 *443 miles northeast from the Jim Bridger Power Plant, to operate a scraper hauling dirt. Under the hiring hall procedure, petitioner could have been sent to any of 200 contractors within the State of Wyoming. Although Bechtel has continued to hire operators at the Jim Bridger Power Plant, petitioner had not worked there again as of the date of trial. Since becoming a member of the local union petitioner has not been dispatched for any work within 80 miles of his residence in Lander, Wyoming. Except for his employment at the Jim Bridger Power Plant, petitioner has never worked on any job for more than one year. As previously noted, the Jim Bridger Power Plant was in the vicinity of Rock Springs, Wyoming. The population of Rock Springs grew from 11,000 in 1971 to 26,000 by 1973. The hospital, housing and school facilities were not able to keep pace with the population growth. Lodging facilities in the area were minimal. Many people who came to work in the area slept in tents, campers, and cars. Petitioner was fortunate in June 1972 in obtaining lodging in a condemned section of the Park Hotel in Rock Springs. He paid $15 a night for a room; there was one bathroom facility to *444 serve the tenants on the three-floor condemned portion of the hotel. In November 1972 petitioner was able to rent a two-room garage apartment vacated by a friend. The apartment had a kitchen, but petitioner was afraid to cook due to a gas leak in the stove. Petitioner rented the apartment on a month-to-month basis without a written lease. At least three contractors besides Bechtel in the Rock Springs area were hiring operators during this period. Thus, when petitioner was laid off in May 1973, he continued to pay rent on his apartment because if he didn't have a place to live in the Rock Springs area he couldn't accept a job in that area. When petitioner was laid off in March 1976, he gave up the apartment. By this time the growth rate in the area had slowed and other rental facilities were available. Petitioner's wife and six children remained at their home in Lander while petitioner was employed at the Jim Bridger Power Plant. Petitioner returned to Lander on weekends and during lay off periods. The Rock Springs area suffered from overcrowding, poor health facilities, poor schools, inadequate housing, high real estate costs, prostitution and a high rate of violent crime. *445 On his 1973 and 1974 returns, petitioner claimed $2,872 and $5,058, respectively, as travel expenses incurred for meals and lodging while away from home at the Jim Bridger Power Plant. In his notices of deficiency, respondent disallowed the entire amount of the claimed deductions for both years. Respondent determined that petitioner was not entitled to the claimed travel deductions because petitioner's employment at the Jim Bridger Power Plant was indefinite and therefore petitioner was not away from home. Respondent does not dispute that the amounts claimed were actually expended for meals and lodging while petitioner was employed at the Jim Bridger Power Plant. OPINION Petitioner expended $2,872 in 1973 and $5,058 in 1974 for meals and lodging at Rock Springs while working at the Jim Bridger Power Plant. Respondent contends that these expenditures were non-deductible personal living expenses because they resulted from petitioner's desire to maintain his residence at a place other than that in which his employer's business was located. See Commissioner v. Flowers,326 U.S. 465 (1946). Petitioner contends that these expenses were deductible under section *446 162(a)(2) because they were ordinary and necessary expenses incurred while away from home in connection with his job as an equipment operator. We agree with petitioner.
Personal living expenses are ordinarily non-deductible. Section 262. However, section 162(a)(2) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business * * *." In order to qualify for the deduction, the expense must be (1) reasonable and necessary, (2) incurred while away from home and (3) incurred in the pursuit of a trade or business. Commissioner v. Flowers,supra.
"Home" for purposes of section 162(a)(2) means the taxpayer's principal place of employment. Kroll v. Commissioner,49 T.C. 557, 561-562 (1968). An exception to this general rule is carved out where a taxpayer who maintains a personal residence at one location accepts employment in another area if the duration *447 of this employment is temporary as distinguished from indefinite. Peurifoy v. Commissioner,358 U.S. 59 (1958). The reason for this exception is that such a taxpayer is usually forced to incur duplicate living expenses while he is living near the temporary job site. Kroll v. Commissioner,supra;Jones v. Commissioner,54 T.C. 734, 740 (1970), affd. 444 F. 2d 508 (5th Cir. 1971). In this case, respondent concedes that if we determine that petitioner's employment at the Jim Bridger Power Plant was temporary, petitioner was "away from home" [3] and the expenses in question are deductible as ordinary and necessary business expenses under section 162(a)(2). *448 If termination of employment within a short period of time is foreseeable, such employment is temporary. Verner v. Commissioner,39 T.C. 749, 753 (1963). Whether a job is temporary or indefinite depends upon all the facts and circumstances of the particular case. Id. Relevant factors include the reasonably anticipated duration of the employment, the expectation that it will end in a reasonably short period, the strength of the taxpayer's business, economic and family ties with his original home, the extent of duplication of living expenses, and the foreseeable economic cost of moving his home and family to the new location and back again. See Pazden v. Commissioner,36 T.C.M. 583, 46 P-H Memo. T.C. par. 77,139 (1977). Specifically, the inquiry is whether, in the light of all these circumstances, it is reasonable for the taxpayer to maintain intact his original residence and set up temporary living quarters at his new job location or to move to the new location. Tucker v. Commissioner,55 T.C. 783, 786 (1971). The record in this case substantiates petitioner's claim that his employment at the Jim Bridger Power Plant was temporary. *449 Petitioner was not hired directly by Bechtel; rather, he was dispatched to the job by his union under the union hiring hall procedure. Petitioner was twice sent to Bechtel during the years in issue because his name was at the top of the union's out of work list with respect to the particular type of equipment operator requested by Bechtel.
Petitioner did not have a contractual arrangement with Bechtel, nor was he hired for a specific duration. Compare Jones v. Commissioner,supra;Hummel v. Commissioner,36 T.C.M. 573, 46 P-H Memo. T.C. par. 77,135 (1977); Otness v. Commissioner,T.C. Memo. 1978-481 (1978). In fact, since it was petitioner's job to operate specific machinery for skilled crews such as pipe fitters, electricians, and iron workers, his employment opportunities were completely dependent upon the level of activity of these skilled workers and their need for equipment operators. When petitioner was dispatched as a heater operator in November 1972, he knew that the assignment would last, at most, until spring.Heaters were used on this project during the winter months to keep freshly poured concrete from freezing *450 and to allow it to cure properly. Once the weather become warm, petitioner was assured of being, and in fact was, laid off. Petitioner's name was then placed at the bottom of the union's out of work list. In June 1973, he was dispatched to Bechtel as a hydraulic crane operator. This employment lasted 34 months without a layoff. Respondent contends that petitioner's job during this period was of indefinite duration. Respondent cites Rev. Rul. 60-189, 1960-1 C.B. 60, in which he announced that employment continuing over a period in excess of one year is likely to be indefinite. Respondent on brief notes, however, that we must look to the circumstances of each case and that there is no clear litmus test available.
We agree with respondent that a temporary position may become indefinite if at some point during employment facts change so that an indefinite period of employment becomes foreseeable. Verner v. Commissioner,39 T.C. 749, 754 (1963). In Norwood v. Commissioner,66 T.C. 467 (1976) the taxpayer, a union steamfitter by trade, was asked by Bechtel to remain as foreman for another job, rather than being laid off. This Court *451 held that the character of the taxpayer's employment changed from temporary to indefinite because the taxpayer knew he would continue working for the duration of that assignment and could reasonably have been expected to be rehired by Bechtel. Here, however, the expected duration of petitioner's employment remained temporary. Unlike the taxpayer in Norwood v. Commissioner,supra, petitioner was not given assurances by Bechtel. Petitioner never knew when he might be laid off. In fact, during the 34 months he worked as a hydraulic crane operator at the Jim Bridger Power Plant the number of hydraulic crane operators needed for plant construction fluctuated between 5 and 18 men. Also, as pointed out previously, petitioner's job depended upon the level of activity of others, such as iron workers. He never knew from month to month whether his employment would continue. Petitioner's method of being hired, and the fact he was dispatched for a specific machine to do a specific job made his employment uniquely unpredictable and different from other skilled construction workers such as, for example, carpenters and steel workers. Respondent further contends that petitioner *452 retained his apartment in Rock Springs after being laid off in May 1973 because petitioner expected to be rehired and expected the employment to continue indefinitely. The facts, however, do not support respondent's allegations. Rock Springs had grown from a population of 11,000 in 1971 to 26,000 in 1973; this rapid growth created a grave housing shortage. Many of those who migrated to the area were forced to sleep in tents and cars. Petitioner originally obtained lodging in the condemned portion of a hotel, sharing one bathroom with three floors of tenants. Thus, when a two-room garage apartment became available, petitioner agreed to rent on a month-to-month basis. Petitioner at all times considered this lodging temporary. Petitioner continued to rent the apartment when he was laid off in May 1973 because if he did not have accommodations in the Rock Springs area he could not accept employment in that area. [4] As it turned out, petitioner was dispatched again to Bechtel a month later. When he was laid off in March 1976, petitioner did not retain the apartment because the lodging situation in the Rock Springs area had improved. *453 Petitioner's wife and six children had lived in Lander since 1969. Petitioner considered Lander as his home. His children were in school there and were well adjusted to community life. Rock Springs was not a suitable environment for a family. Pazden v. Commissioner,36 T.C.M. 583, 46 P-H Memo. T.C. par. 77,139 (1977). In light of all the circumstances, we believe that petitioner could not reasonably have been expected in 1973 or 1974 to move his residence to Rock Springs. Throughout this period his employment at Bechtel was subject to termination on very short notice and therefore temporary rather than indefinite. Accordingly, we conclude that the expenses incurred for meals and lodging during the years in issue are deductible under section 162(a)(2). See Babeaux v. Commissioner,36 T.C.M. 657, 46 P-H Memo. T.C. par. 77,154 (1977), on appeal (4th Cir., Oct. 12, 1977). Decision will be entered for the petitioner in Docket No. 10058-75.
Decision will be entered under Rule 155 in Docket No. 6996-76.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Skilled workers include electricians, pipe fitters, iron workers, etc.↩
3. See Rev. Rul. 60-189, 1960-1 C.B. 60, wherein respondent acknowledges that taxpayers who obtain employment through a union hiring hall procedure are not generally considered to be ininerant workers although they are employed for various periods of time on construction work at locations distant from the places where they maintain their residences and make their employment contracts. Compare Bochner v. Commissioner,67 T.C. 824↩ (1977).
4. Including Bechtel, there were four contractors in the Rock Springs area.↩